```
 1              UNITED STATES DISTRICT COURT FOR THE
       EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS
 2

 3   COTTER CORPORATION N.S.L.,      )
                                     )
 4                  Plaintiff,       )
                                     )
 5   v.                              )   No. 4:19-MC-00774-AGF
                                     )
 6   UNITED STATES OF AMERICA, et al,)
                                     )
 7                  Defendants.      )

 8

 9                      RULE 27 HEARING

10        BEFORE THE HONORABLE AUDREY G. FLEISSIG
                UNITED STATES DISTRICT JUDGE
11

12                   NOVEMBER 25, 2019

13   APPEARANCES:

14   For Plaintiff:    John McGahren
                       MORGAN AND LEWIS LLP
15                     502 Carnegie Center
                       PRINCETON, NJ 08540
16
     For Defendants:   Phillip R. Dupre (for United States)
17                     U.S. DEPARTMENT OF JUSTICE
                       Environmental Defense Section
18                     PO Box 7611
                       Washington, DC 20044
19
                       David L. Dain (for USA, by phone)
20                     U.S. DEPARTMENT OF JUSTICE
                       Environmental Enforcement Section
21                     PO Box 7611
                       Washington, DC 20044
22
                       William Garland Beck (for Republic
23                     Services, Bridgeton Landfill,
                       and Allied Services)
24                     Allyson E. Cunningham (by phone)
                       LATHROP GAGE, LLP
25                     2345 Grand Blvd., Ste. 2200
                       Kansas City, MO 64108
```

```
 1                     David R. Erickson (for Malinckrodt, by
                       phone)
 2                     Steven D. Soden (by phone)
                       SHOOK AND HARDY, LLP
 3                     2555 Grand Blvd.
                       Kansas City, MO 64108
 4
                       Richard E. Greenberg
 5                     GREENSFELDER HEMKER, PC
                       10 S. Broadway, Ste. 2000
 6                     St. Louis, MO 63102

 7

 8
     REPORTED BY:      PATTI DUNN WECKE, RMR, CRR, CMRS
 9                     Official Court Reporter
                       United States District Court
10                     111 S. Tenth Street
                       St. Louis, MO 63102
11                     314-244-7984

12

13       PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (THE FOLLOWING PROCEEDINGS WERE HAD ON NOVEMBER

2    25, 2019, BEGINNING AT APPROXIMATELY 4:00 P.M., IN OPEN

3    COURT:)

4          THE COURT:  Good afternoon.  We are here in the

5    matter of Cotter Corporation N.S.L. v. United States of

6    America et al.  It is case number 4:19-MC-00774-AGF.  And

7    here in the courtroom on behalf of the plaintiff Cotter

8    Corporation is Mr. John McGahren.  And do we have another

9    attorney on behalf of Cotter?  Is there anyone else on

10   behalf of Cotter on the phone?

11         MR. MCGAHREN:  No, Your Honor.

12         THE COURT:  And then here in the courtroom we

13   have Phillip Dupre, correct?

14         MR. DUPRE:   Yes, Your Honor.

15         THE COURT:  And you are here on behalf of the

16   United States; is that correct?

17         MR. DUPRE:   Correct, Your Honor.

18         THE COURT:  Then we have other people here on the

19   telephone on behalf of the United States; is that correct?

20         MR. DAIN:  Yes, Your Honor.  This is David Dain

21   on behalf of the United States.

22         THE COURT:  Anyone else on the telephone on

23   behalf of the United States?  All right.

24         And then we have on behalf of Republic Services

25   Inc., do we have Allyson Cunningham; is that correct by

1    telephone?

2              MS. CUNNINGHAM:  That's correct, Your Honor.

3              THE COURT:  Anybody else here in the courtroom or

4    by telephone on behalf of Republic?

5              MR. BECK:  Your Honor, William Beck on behalf of

6    Republic, Bridgeton Landfill, Allied Services.

7              THE COURT:  All right.  I had you down for

8    Bridgeton but I didn't have you down for all the others.

9    So it's Republic?

10             MR. BECK:  Bridgeton, and Allied Services, along

11   with Ms. Cunningham for all three.

12             THE COURT:  Okay.  And then on behalf of

13   Mallinckrodt, Mr. Erickson, do we have you here on the

14   phone?

15             MR. ERICKSON:  Yes, Your Honor. I'm here with

16   Steve Soden.

17             THE COURT:  All right.  Anybody else either here

18   in the courtroom or by telephone?  Who did I miss here?

19             MR. GREENBERG:  Judge, Richard Greenberg.  I'm

20   here for EverZinc U.S.A. Inc.

21             THE COURT:  I'm sorry, you're here for who -- I'm

22   sorry, I didn't see a third page here.  All right.  So

23   Richard Greenberg for EverZinc.

24             Did we miss anybody?  Is there anyone on the

25   telephone who is having trouble hearing me?  Now, I just

1  want to tell you that the folks on the telephone are not

2  going to hear you unless you are at a microphone which

3  makes it real easy for the folks at these two tables but I

4  don't believe that any microphone has been put on that

5  middle table.  So just understand, no one is going to hear

6  you when you are speaking unless you come up here and speak

7  at the lectern.

8           So I'm not sure how you all want to proceed.  I

9  have to be honest with you, I haven't digested everything

10  that you all filed.  I didn't realize that this issue was

11  as controversial as it was until Friday, and I've been

12  pretty tied up today.  So I've reviewed as much of this as

13  I had time to review.  And I think the first question I

14  have for you all is I'm assuming that we are all in

15  agreement that issues with respect to the attorney-client

16  privilege and the scope of it are matters of state law,

17  yes?

18           MR. MCGAHREN:  Your Honor, I have an order that

19  was signed this morning by the --

20           THE COURT:  I understand.  I just want to take

21  this one at a time.  Does anybody contend that issues with

22  respect to the attorney-client privilege are not matters of

23  state law?

24           MR. BECK:  We do, Your Honor.  This is Bill Beck

25  for Bridgeton Landfill, Allied Services, Republic Services.

1  With respect to the privilege question, Rule 501 provides

2  that federal common law of privilege applies in a federal

3  question case where state law does not supply the rule of

4  decision.  The entire purpose of this preservation, the

5  portion of the deposition that's before this Court under

6  Rule 27 is to preserve testimony for claims that will be

7  brought under CERCLA, the Comprehensive Environmental

8  Response, Compensation, and Liability Act under federal law

9  in federal Court, and it's strictly a federal question

10  claim.  So our position is that federal law not state law

11  governs the assertion of privilege with respect to this

12  portion of the deposition.  It's being taken simultaneously

13  for a state case and this case, but for Your Honor's

14  portion we believe federal law controls because there's no

15  state rule of decision.

16          THE COURT:  All right.  And do you believe that

17  the federal common law is different than Missouri state law

18  with respect to that?

19          MR. BECK:  We certainly think it's different than

20  the state court judge has applied.  We think under the

21  federal common law, the Upjohn case, the communications

22  between attorney and client for the purpose of obtaining

23  legal advice are privileged, and when produced that way

24  it's the subject matter of privilege.  The state court took

25  a narrow review under Missouri law and ruled only advice

1    between attorney and client is privileged rather than

2    communication for the purposes of obtaining advice.  So we

3    think they are different to that degree, Your Honor.  I'm

4    not suggesting agreement with the state court judge's

5    decision, I'm saying that's what he's ruled so that would

6    create a conflict.

7              THE COURT:  I see.  My question is not whether

8    you disagree or agree with the state court judge.  My

9    question is whether you are asserting that the applicable

10   law under the federal common law is different than the

11   state law?

12             MR. BECK:  I've got to be careful how I answer

13   that because I've got to preserve the position I've taken

14   in the state court.  And under that position the answer

15   would be no, but certainly the federal law is clearly under

16   Upjohn that extends to communications to obtain legal

17   advice not just the advice itself.  And that by producing

18   such communications there's a live issue of waiver for Your

19   Honor that applies to the federal portion of the

20   deposition.

21             THE COURT:  All right.  Thank you.  Anyone else

22   want to weigh in on that issue?

23             MR. DUPRE:   Your Honor, in general we don't

24   believe these questions of which law applies are

25   dispositive, but would say that the question of whether a

1    party has impliedly waived its privilege is one that we

2    believe federal common law applies to and the Court should

3    look to federal court precedent to help decide that

4    question.

5            THE COURT:  And were you all present and given an

6    opportunity to participate when the state court judge was

7    making his determination?

8            MR. BECK:  The answer is yes as to us, but no as

9    to everyone else.  It was just Mr. McGahren and me in that

10   proceeding, Your Honor.

11           MR. MCGAHREN:  More over, Your Honor it was

12   Mr. Beck that filed the motion in state court seeking a

13   ruling that he's now questioning.

14           MR. DUPRE:   Your Honor, the United States is not

15   a party to the state court litigation, was not at the

16   hearing, did not file anything at the hearing.

17           MR. SODEN:  Your Honor, this is Steve Soden at

18   Mallinckrodt, and the same applies to Mallinckrodt.

19           MR. GREENBERG:  That is also the case, Your

20   Honor, with EverZinc U.S.A., we were not at the hearing and

21   we're not a party to that litigation.

22           THE COURT:  So Mr. McGahren, I'm assuming that

23   your position, based upon what I read in the reply, and I'm

24   assuming that you've got a written order that is consistent

25   with the voice mail notification that you had presented,

1  I'm assuming that your position is that this Court should

2  not reach that --

3        MR. MCGAHREN:  No, Your Honor, that's not

4  necessarily our position.  Our position is we wanted to

5  have all these issues before this Court.  Mr. Beck chose to

6  file the motion that he filed in state court.  The Court

7  ruled not in his favor and now he's seeking a second

8  determination.  I'm not quite sure as to the scope of what

9  he's seeking.  It hasn't been really briefed other than

10  he's looking for all the documents on Cotter's privilege

11  log in the state court litigation, that's my understanding

12  of what he's seeking here.

13        THE COURT:  But even if I were to assert estoppel

14  with respect to Mr. Beck, what does that have to do with

15  the other parties who are not parties to that litigation?

16        MR. MCGAHREN:  The other parties took different

17  positions and some of the parties didn't take any positions

18  at all, Your Honor, so EverZinc didn't file anything.

19        THE COURT:  In state court?

20        MR. MCGAHREN:  Oh, I'm talking about here, Your

21  Honor.

22        THE COURT:  All right.  But some of the parties

23  have taken positions here, for instance Mallinckrodt has

24  filed a position here asserting waiver, correct?

25        MR. MCGAHREN:  Yes, Your Honor.

1    THE COURT:  And even if I were to determine that

2  some level of estoppel would relate with respect to

3  Mr. Beck's clients, how would that impact the other parties

4  who are here before this Court?

5    MR. MCGAHREN:  I don't think it does, Your

6  Honor.

7    THE COURT:  All right.  But do you want to go

8  ahead and give me that order for whatever it's worth?  I

9  mean, it appears to me that I will have to reach this issue

10  notwithstanding that order in light of the fact that there

11  are other parties before this Court who were not a party to

12  this proceeding.

13    All right.  So now that I kind of made sure that

14  I had kind of the general lay of the land, I will hear from

15  you Mr. McGahren.

16    MR. MCGAHREN:  Yes, Your Honor.  Like Your Honor,

17  I haven't had a hearing on a Rule 27 petition, although

18  I've filed quite a few of them over the years.

19    THE COURT:  My first one, too.

20    MR. MCGAHREN:  Usually people want to perpetuate

21  testimony.  This one is a little unique in that it involves

22  a lawyer that represented Cotter Corporation.  And this

23  particular lawyer happens to be the only living witness

24  with respect to communications with various federal

25  agencies that occurred back in the early 1970s and related

1    to the disposal of material generated by the United States

2    and Mallinckrodt that ended up in Westlake Landfill.

3          The judge specifically focused in state court in

4    his ruling on a memorandum that was prepared by Mr.

5    McGrath, Ed McGrath is his name.  And Mr. McGrath at the

6    time wrote a fairly contemporaneous memorandum describing

7    the history of Cotter's relationship with the Latty Avenue

8    site and their discussions with federal regulators.

9    There's only one sentence in that memo that Cotter sought

10   to protect as attorney-client work product, it was opinion,

11   that's what the judge focused in the state court.

12          THE COURT:  As work product or opinion?

13          MR. MCGAHREN:  Opinion, Your Honor.  And the rest

14   of the memorandum the judge says was not privileged or work

15   product, it's merely a recitation of facts.  As I

16   mentioned, Your Honor, Mr. McGrath is the only living

17   witness that can testify to these communications with

18   various federal agencies that related to this disposal and

19   to the decommissioning of Latty Avenue.  So that's what we

20   are seeking to preserve his testimony on.  We followed the

21   requirements of Rule 27.  We have provided a declaration

22   with the anticipated testimony.  We went way beyond the

23   requirements of Rule 27 and produced all of the documents

24   that Cotter had produced in the McClurg litigation which

25   was previously before Your Honor.  We produced privilege

1  log and we've had numerous conversations with counsel about

2  the logistics of the deposition, where it would take place.

3  Originally we were trying to schedule it up in Maine, we're

4  now doing it down in Florida where Mr. McGrath spends the

5  winter.  We think it will take place over two days on

6  December 2nd and 3rd.  I'm not clear what Mr. Beck's

7  position on this, but in the state court he withdrew the

8  portion of the motion above and beyond the memorandum.

9  It's the subject of the order.  And reserved his right to

10  make objections after the deposition.  Frankly, Your Honor,

11  that's what I had recommended in the first place.

12          THE COURT:  And I wasn't really sure what that

13  meant, and I wasn't sure what that meant in the judge's

14  order either.  So I understand that the judge here is

15  saying that the memorandum itself is not privileged and

16  that the attorney work product part on page four was

17  properly redacted.  And where it says here:  The remainder

18  of the motion seeking production of McGrath related

19  documents is withdrawn.

20          So does that mean that vis-a-vis Mr. Beck that he

21  was going forward with the deposition without insisting

22  that any documents he believes -- privileged documents that

23  he believes should be produced need to be produced in

24  advance of the deposition?

25          MR. MCGAHREN:  I'll let Mr. Beck speak to that.

1          THE COURT:  I wasn't sure what that meant.

2          MR. MCGAHREN:  With respect to their position,

3   Your Honor, they filed basically the exact motion in state

4   and federal court.

5          MR. BECK:  That's fair, Judge.  We had filed a

6   motion seeking production of the redacted portion of the

7   1975 McGrath memo, and also seeking the contemporaneous

8   documents on Cotter's privilege log that were on presumably

9   the same subject matter.  At the hearing I made a decision

10  to withdraw without prejudice all portions of the motion

11  except as to the McGrath memo which Judge Walsh reviewed in

12  camera and issued this ruling.

13         THE COURT:  You mean with respect to the

14  redaction?

15         MR. BECK:  Yes, with respect to the redaction.

16  So that was the only thing he had before him to rule.

17         THE COURT:  So your client's position was to go

18  forward with the deposition without attempting to obtain

19  the privileged -- what you believed were privileged

20  documents as to which the privilege had been waived?

21         MR. BECK:  Correct, in the state case knowing

22  that we were coming here, but also with specific reference

23  at the end of this order that we may reassert the motion

24  once we've laid a testimony of foundation at the deposition

25  that we believe will more likely persuade Judge Walsh.

1          THE COURT:  So honestly folks, that's one of the

2     issues that I need to -- I mean, the main issue that I

3     assumed was before me it was whether or not you all are

4     seeking the production of documents in advance of the

5     deposition or whether everybody is comfortable going

6     forward with the deposition trying to establish what the

7     basis is for some of the statements in the memorandum as

8     well as in the affidavit, because in some of these I wasn't

9     totally sure what the basis of the knowledge was or the

10     purpose for which the communication might have taken place.

11     And I assumed that you all would be able to establish that

12     information at Mr. McGrath's deposition.  I'm assuming and

13     I understand that Mr. McGrath is elderly and nobody knows

14     what's going to happen tomorrow, but to anyone's knowledge

15     does Mr. McGrath currently have any terminal illness or

16     anything that is going to cause concern about like his

17     likelihood to be around after December 3rd?

18          MR. DUPRE:   Your Honor, I cannot speak to

19     Mr. McGrath's health, but if you would allow me to I would

20     like to speak to why we think these issues are appropriate

21     to be resolved prior to the deposition.

22          I think there's really two issues here.  One is

23     whether or not Cotter has already waived the

24     attorney-client privilege with respect to the advice

25     Mr. McGrath gave Cotter on disposing of this radioactive

1    material through its voluntary production of this 1975

2    memorandum and the declaration that was signed last April.

3    We would be happy to get into that in detail if the Court

4    would like.

5              In addition, we believe what Cotter is trying to

6    do is set up an advice of counsel type defense.  Indeed,

7    this was essentially explicitly said to us that they would

8    like to establish it through Mr. McGrath's deposition

9    testimony that Cotter acted in good faith in depositing

10   radioactive material at the Westlake Landfill.  And while

11   we have no objection with respect to Cotter establishing

12   that, that opens up and waives the attorney-client

13   privilege as to whether in fact Cotter did act in good

14   faith and relied on its counsel's advice.  In particular,

15   because we don't know when litigation will proceed with

16   Mr. McGrath, we don't believe it will be appropriate to

17   wait five years to see what Cotter puts into its initial

18   pleadings and only then figure out for sure how they intend

19   to use his testimony.

20             THE COURT:  Let me take this in two steps.  I

21   mean, one step is whether or not Cotter is going to assert

22   a good faith defense based upon Mr. McGrath's advice.

23             MR. MCGAHREN:  That's not a defense under CERCLA,

24   Your Honor.

25             THE COURT:  All right.  And I assume you all can

1    get that position in writing or not in writing from the

2    defendant.

3              MR. DUPRE:   Actually, Your Honor, my

4    understanding is, and to be clear there's not a good faith

5    defense to CERCLA liability, but they will be arguing with

6    respect to an allocation of response costs that Cotter

7    acted in good faith and that should affect the allocation

8    of response costs.  If Cotter would like to disclaim that

9    argument now, that would be helpful.

10             THE COURT:   So that is what I am -- it seems to

11   me that you all ought to be able to determine at least in

12   the near future whether or not Cotter is going to be

13   asserting good faith with respect to allocation of response

14   costs.

15             MR. MCGAHREN:   Your Honor, again he was speaking

16   to a defense that they cited with respect to the US v.

17   Exxon case.  That is not a defense to CERCLA liability.

18   There are three enumerated defenses to CERCLA liability,

19   that doesn't fall within them.  So it's not even on point.

20   We're trying to elicit facts.

21             THE COURT:   I understand, but does it then follow

22   that Cotter is not making such a good faith argument?

23             MR. MCGAHREN:   We want to use all the facts

24   elicited in the case to develop our own inequitable

25   allocation case.  I don't know what that would be at this

1  point, Your Honor.  I haven't gotten all the facts from all

2  the parties.  We have no discovery against the United

3  States.  We're simply trying to preserve testimony of a

4  witness who was on the grounds --

5          THE COURT:  But in the context of an equitable

6  allocation argument, would Cotter essentially be asserting

7  an advice of counsel, effectively asserting?

8          MR. MCGAHREN:  Not advice of counsel, no Your

9  Honor, we would not be asserting that.  We might be

10  asserting facts obtained from Mr. McGrath.

11          THE COURT:  I understand.  And what is it that

12  the Government believes Cotter would be arguing?

13          MR. MCGAHREN:  Excuse me, Your Honor, one more

14  thing I want to say.  I think when the testimony is taken

15  it will be borne out that Mr. McGrath was not involved in

16  advising on disposal at Westlake Landfill, but that can be

17  determined at the deposition.

18          MR. DUPRE:  Your Honor, Cotter has set forth in

19  both its petition and in Mr. McGrath's declaration legal

20  conclusions by Mr. McGrath that they want to elicit at his

21  deposition.  For instance, in their petition itself in

22  paragraph five they say:  Mr. McGrath has factual knowledge

23  of federal regulations governing the leached barium sulfate

24  that was dumped in Latty Avenue.  The petition also asserts

25  that Mr. McGrath is going to establish based on personal

1  knowledge that Cotter's license with Atomic Energy

2  Commission allowed Cotter to dump this leach barium sulfate

3  at the Westlake Landfill.

4        Mr. McGrath's understanding of what the law was

5  at the time is only relevant to the extent that he advised

6  his client, Cotter, that those activities were legal.

7  Obviously Mr. McGrath cannot give expert testimony as to

8  what the law was, that is the province of the courts.  If

9  he wants to testify that he thought the disposal of leach

10 barium sulfate at Westlake Landfill was permissible under

11 AEC regulations, that's only relevant again if he told his

12 client and his client relied on that.  And we think that's

13 clearly what Cotter is trying to establish here that his

14 client worked with their counsel and acted in good faith.

15 And we believe that it would be unfair to essentially let

16 them hide the ball and not let us ask follow-up questions

17 on these quote/unquote factual statements about what the

18 law was at the time.

19        MR. MCGAHREN:  Your Honor, there were only two

20 documents on Cotter's privilege log that predate the

21 disposal at Westlake Landfill that pertain to Mr. McGrath.

22 So I just want you to be aware of that, Your Honor.  But in

23 terms of hiding the ball, Mr. McGrath is going to testify

24 that he told the United States and the United States was

25 fully aware of the disposal that was ongoing at Westlake

1  Landfill, and they don't want that to be out.

2         THE COURT:  All right.  I don't know that I still

3  have gotten an answer to the question that I asked.  My

4  question is what is it with respect to Cotter's announced

5  intention to make an equitable allocation argument -- am I

6  stating that correctly?

7         MR. MCGAHREN:  Yes, Your Honor.

8         THE COURT: What is it that the United States is

9  claiming would give rise to a waiver of any attorney-client

10  privilege were Mr. McGrath's testimony to be elicited?

11         MR. BECK:  Yes, Your Honor.  I think it's

12  important to note a party can make essentially a good faith

13  argument that they acted in good faith.  And to the extent

14  they use their counselor's testimony and advice to make

15  that, that constitutes an implied waiver of the privilege

16  even if it is not actually a pure defense to liability.  So

17  here, as we understand it and as I think is very clearly

18  set forth in the declarations by Mr. McGrath, they are

19  going to argue that Cotter, because it relied on the advice

20  of its attorney, should have to pay less money to clean up

21  the Westlake Landfill than other parties who are also

22  liable at the site.

23         THE COURT:  But that is the question that I

24  believe you all can establish one way or the other.  Now,

25  can we all agree that one can have conversations with one's

1  attorney that are not privileged communications?

2          MR. DUPRE:  Of course, Your Honor.

3          THE COURT:  All right.  So an attorney may well

4  be involved in discussions with third parties, including

5  third party regulators?

6          MR. DUPRE:  Correct, Your Honor.

7          THE COURT:  And the discussions that that

8  attorney has with the third party regulator, including

9  reporting back to the client what the third party regulator

10 said, are not privileged?

11         MR. DUPRE:  Your Honor, I would disagree

12 slightly on this last point.  I think likely, although we

13 don't know, when parties -- when a lawyer recounts

14 something to his client and says I met with the regulatory

15 agency and he didn't answer my question or whatever it is,

16 the factual information, usually that's going to be coupled

17 with the attorney's legal advice about that, what that

18 statement --

19         THE COURT:  Well, maybe so, but the party is

20 either seeking to use that legal advice or not seeking to

21 use that legal advice in connection with the defense here.

22 So are you saying to me that if there is litigation ongoing

23 and the client authorizes the attorney to go make a

24 settlement -- well, to go make some form of request to the

25 other party, and they go and make that request to the other

1    party, and the other party says:  No.  Forget it.  Not

2    doing that.  And the attorney comes back and reports to the

3    client the party said:  No.  Forget it.  Not doing that.

4    That -- and they thereafter engage in a discussion about

5    what the attorney's advice should be in light of that

6    response.  Are you telling me that the client -- the

7    attorney's statement to the client reporting what was said

8    is privileged?  And if so, give me the case that you are

9    relying on for that proposition because I don't buy it.

10            MR. DUPRE:   Your Honor, generally speaking the

11   facts -- and I think this is something that is relevant

12   here -- most of the substantive facts that are put forth in

13   Mr. McGrath's declaration are actually just him citing to

14   documents and saying this document is authentic and says

15   what it says.  We have no problem with Mr. McGrath

16   authenticating documents, but he diverge from simply

17   confirming the authenticity of communications with the

18   regulator in this case, the AEC, and says for instance in

19   paragraph four of his declaration:  My review of the then

20   existing AEC regulations combined with my years of

21   experience in dealing with the AEC in such matters

22   indicated that diluting the leach barium sulfate with soil

23   to, quote, unimportant quality and quantities was

24   permissible.  And then he cites to the code of federal

25   regulations.  That statement there, which is clearly

1 testimony they want to elicit, is Mr. McGrath's legal

2 opinions.  And again, this information is only relevant if

3 it was communicated to his client.

4 　　　　　I guess to directly answer your question, I think

5 there are some circumstances in which what -- while the

6 underlying facts of a communication from a third party to a

7 lawyer are clearly not privileged, I think the case law

8 says that when a lawyer communicates that you can't sort of

9 pick and choose the content of those communications.  So if

10 the lawyer is testifying as to half of his conversation

11 with his client, I told the client X, we actually do

12 believe that in many cases that will lead to a waiver of

13 the second half of that conversation.  But again here, I

14 think just peaking beneath the surface of these

15 declarations makes clear that if all Mr. McGrath is going

16 to testify on, I was at a meeting with a third party, this

17 third party said X, we wouldn't be here today.  It is other

18 parts of the declaration including in the 1975 memo where

19 Mr. McGrath states, quote, that, you know, by way of

20 commentary we note the following, and then gives -- it's on

21 page eight.

22 　　　　　THE COURT:  It's at the end of the '75 memo.

23 　　　　　MR. DUPRE:   Again, Mr. McGrath's commentary on

24 the facts in 1975 --

25 　　　　　THE COURT:  Paragraph A and B at the end of page

1    eight.

2              MR. DUPRE:    Again, while it's true some of these

3    facts in the 1975 memo we would concede, to the extent he

4    had personal knowledge he can testify as to that.  But

5    other parts of this, including his commentary, contain

6    privileged communications or he learned through privileged

7    communications by his client.

8              So ultimately, Your Honor, we believe that if

9    they are going to elicit testimony to argue Cotter acted in

10   good faith relying on the advice of their attorney and that

11   therefore they should have a lower allocation of response

12   costs, which I think clearly they intend to do, then we

13   should be able to ask follow-up questions and have the

14   finding that there has been a waiver of privilege.

15             As to whether or not there's any harm in going

16   ahead and taking that deposition for these next two days

17   and then having further motions practice after that

18   deposition --

19             THE COURT:  Well, that is what seemed to be a

20   better course of action to me at this moment, because --

21   and Mr. McGahren, I don't mean to cut you out of this

22   discussion.

23             MR. MCGAHREN:  I'm enjoying the discussion, Your

24   Honor.

25             THE COURT:  I know that this is your motion and I

1  am going to allow you to speak, but it seems to me that

2  during the course of the next week or so, you all could

3  have some discussion with respect to how Cotter intends to

4  use the testimony of Mr. McGrath.  And while I understand

5  that you all may not get to these points for years in the

6  litigation, presumably if Cotter makes that representation

7  now and in some fashion limits the use of Mr. McGrath's

8  testimony, and four years from now when it becomes

9  relevant, if in fact Mr. McGrath is no longer available,

10  maybe he will be available as a witness, maybe he will be

11  here in wherever in court to testify -- please tell me it

12  won't be here -- so maybe he will be available to testify.

13  But if he's not, then I would presume that Cotter is going

14  to be limited to the use of Mr. McGrath's deposition in

15  that manner based upon the representation that it is making

16  that everyone else is relying upon in that deposition.  So

17  that's one issue.

18          And if in fact when -- if Cotter is unwilling to

19  make any such representation or the representation that

20  Cotter makes is something that one or more parties here

21  believe gives rise to a waiver akin to the type of waiver

22  that would occur if one had an advice of counsel defense

23  upon which they were relying, then we would be in a

24  position to address that issue.  But at this moment in time

25  I don't know that you all have really had the discussion

1  necessary to get a clear picture on how Cotter intends to

2  use the testimony and whether in fact it is willing to make

3  a representation as to how it would use that testimony.

4  That's one issue.

5  Second issue, it appears to me that if we were to

6  go forward with the deposition which you all are going to

7  do anyway on December 2nd and 3rd, correct?

8  MR. MCGAHREN:  Yes, Your Honor.

9  MR. BECK:  We're certainly planning to attend.

10  THE COURT:  All right.  It seems to me -- and I

11  have personally lots of questions here.  As I read through,

12  for instance, the affidavit, there were numerous paragraphs

13  in there where I said, okay, that is just a fact.  On this

14  day I did this.  I had this conversation with a third party

15  and this is what was said.  Or I sent this letter or I

16  received this letter.  Or on date X I advised the

17  regulators that this was what Cotter intended to do.  Those

18  are matters upon which Mr. McGrath would have personal

19  knowledge.  They would not typically fall within the

20  attorney-client privilege, and I think his testimony with

21  respect to those matters could be preserved.

22  There are other questions where, I mean, so for

23  instance, I look at paragraph 23 of the affidavit which

24  says to me, faced with no other viable options Cotter

25  decided to mix the 8,700 tons of LBSR with approximately

1   39,000 tons of soil to dilute the amount of uranium in the

2   total mixture to less than the regulated activities.  Well,

3   what's the basis of Mr. McGrath's knowledge on that point?

4   What is the basis for what purpose did he obtained that

5   knowledge?  For what purpose is that information being

6   provided in the affidavit?  Those I think would be very

7   important questions for me to have the answer to that I

8   don't have the answer to right now, which I assume counsel

9   would be able to determine during the course of the

10  deposition.  Which would then put us in a position to make

11  a determination with respect to waiver, having received

12  that information.

13          MR. MCGAHREN:  We're not looking to preclude any

14  of these counsel from asking whatever questions they want,

15  Your Honor.

16          THE COURT:  And with that type of questioning I

17  believe that we would have such a record just because as I

18  go through this affidavit most of the items that I see do

19  not cause me concern with respect to attorney-client

20  privilege.  I'm just telling you what I felt as I read it.

21  Because they were the kind of fact -- relating of factual

22  events that occurred that involved third parties.

23          MR. BECK:  May I respond to that?

24          THE COURT:  You may.

25          MR. BECK:  We have taken the position that the

1  production of the 1975 memo itself is a waiver of privilege

2  because the memorandum as a whole is an attorney-client

3  communication.  It was written by Mr. McGrath as lawyer to

4  Mr. Marcott who is the chief decisionmaker at Cotter, his

5  client, in 1975.  So the whole document is at its essence

6  attorney-client communication.  It also recites in three

7  separate places, which are the last paragraph on page one

8  and the second and fourth paragraphs on page six.

9            THE COURT:  Let me get there.  Okay.  Go ahead.

10           MR. BECK:  It also recites at the bottom of page

11 one a specific conversation that Mr. McGrath had with

12 Cotter --

13           THE COURT:  Yes, I had noted that.

14           MR. BECK:  -- Preliminary to -- well, presumably

15 for the purpose of information to do his job as a lawyer.

16 And then on page six in both the second and fourth

17 paragraphs there's additional instances where Mr. McGrath

18 specifically describes conversations he had with his client

19 in this memorandum.  So the memorandum contains

20 attorney-client discussions, at least those three.  I would

21 say it contains others where he couldn't be reciting what

22 Cotter knew, felt, believed, or why it did something unless

23 his client told him that, so inherently those are

24 attorney-client communication.

25           The entire body of that was incorporated into an

1  attorney-client communication that Cotter voluntarily

2  produced, which is the memo.  And then the memo was adopted

3  in paragraphs 35 and 36 of the declaration in 2019 as an

4  accurate expression of what had occurred in this time frame

5  between the late 1960s and early 1970s when Cotter made the

6  decision to send licensed atomic material to my client's

7  landfill.

8          And so all of that we think constitutes a waiver.

9  And all of those communications including the ones factual

10 are part of an ongoing conversation so that Mr. McGrath can

11 work with them on the question of whether or not this

12 supposed dilution to below what he called a regulated

13 quantity or regulated threshold under the Atomic Energy

14 Act, it was all part of that conversation, which inherently

15 was advice.  So we think there's been a waiver now.  We

16 also think, as Your Honor does, there'd be a much better

17 record on the issue after the deposition.  And it's

18 perfectly fair with me if Your Honor prefers to reserve the

19 issue for then.

20          I would ask for two things in that respect, and

21 one is, just so the Court retains jurisdiction to decide

22 it, and the Court provides that if Your Honor determines

23 that based on the total of what we have now plus what we

24 have at the deposition, there's something new that should

25 be disclosed to us from the privilege log, then we'd have

1   the opportunity to ask Mr. McGrath questions about that.

2   His deposition wouldn't be closed until that determination

3   had been made one way or the other.  No motion or denied

4   motion or granted motion, and we finish the deposition.

5           THE COURT:  Mr. McGahren, does Cotter have any

6   objection to proceeding in that fashion?

7           MR. MCGAHREN:  Just a question.  What if he dies

8   before the next proceeding?

9           THE COURT:  Then you all will have to make a

10  determination, some judge some day will have to make a

11  determination with respect to whether that deposition can

12  be used or not, because that would require -- if you all

13  moved forward with the understanding that you would

14  expeditiously make whatever additional record you wanted to

15  make following his deposition so that any follow up would

16  occur again promptly.  But if in fact he died before that

17  then I would, if everybody agreed, that I would have the

18  ability to do the follow up, I wouldn't be able to make a

19  determination with respect to whether there has been a

20  waiver.  If there has been a waiver, then Cotter would have

21  to produce additional materials to the parties.  And some

22  other day some judge who is involved in your litigation,

23  which hopefully will not be me, will make the determination

24  with respect to whether the deposition of that absent party

25  can or cannot be used.

1       MR. MCGAHREN:  And if I can understand a little

2   more from Mr. Beck, the deposition will clear up just what

3   he said.  Basically what he was talking about was advice

4   with respect to disposal of materials in Westlake Landfill

5   proactively.  I think the deposition will clear that up.

6       MR. BECK:  And I just wish, Your Honor, to hold

7   the deposition open and not conclude it if there is a

8   motion filed to be filed, which is normally the typical

9   procedure.

10      THE COURT:  Right.  And that's really the issue

11  is whether Cotter and the other parties here are agreeable

12  to proceeding in that fashion.

13      MR. MCGAHREN:  With respect to the scope of the

14  waiver that Mr. Beck is seeking, at this point I'm a little

15  confused.

16      THE COURT:  The scope of the waiver?

17      MR. MCGAHREN:  The scope of waiver that he laid

18  out in his papers.

19      THE COURT:  Well, I think Mr. Beck's position is

20  that by disclosing this 1975 memorandum which he believes

21  is advice of counsel, true?

22      MR. BECK:  Yes.

23      THE COURT:  That the attorney-client privilege

24  with respect to at least -- now you all know the facts here

25  and I don't -- but at least with respect to clean up Latty

1   Avenue storage site, would be waived.

2           MR. BECK:  I would say it's broader than that

3   because the memo despite its title discusses the propriety

4   of sending the leach barium sulfate residue and dirt to my

5   client's landfill, the Westlake Landfill.  That's part of

6   the subject matter of the memo, that's part of the subject

7   matter we say is waived.

8           THE COURT:  But I understand that you all would

9   be going forward and taking the deposition to establish

10  some of this information on a more micro level?

11          MR. BECK:  Correct, Your Honor.

12          THE COURT:  The who, the what, the where, the

13  why, the how, and then present both the large and the

14  smaller privilege potential waiver issues to me.

15          MR. BECK:  Correct, Your Honor.

16          MR. MCGAHREN:  I just want to be clear that the

17  scope he is seeking is limited to Mr. McGrath's

18  communication with Cotter.

19          THE COURT:  I don't know if that's true or not.

20  I don't know.  I mean, the question is if Mr. McGrath, if

21  you have waived the attorney-client privilege with respect

22  to a particular issue, I don't know that it would

23  necessarily be a single attorney specific.  I think that

24  would really depend upon what was going on and how defined

25  different parties' roles were.  I don't know that I can

1  categorically say yes or no.

2          MR. MCGAHREN:  The papers that were submitted he

3  was seeking the 40 documents off the privilege log that was

4  provided.

5          THE COURT:  And I'm assuming that those included

6  documents that were not with respect to Mr. McGrath?  Or

7  are those all McGrath documents?

8          MR. MCGAHREN:  They're not all McGrath documents.

9          MR. BECK:  I think actually we were looking for

10 the 40 documents of more than 40 on the privilege log that

11 did involve Mr. McGrath.  But I agree with Your Honor that

12 if there is a waiver it goes to the subject matter which

13 may not be limited to a single witness.

14         THE COURT:  It may or may not be?

15         MR. BECK:  May or may not.

16         THE COURT:  But right now I don't know what

17 Mr. Beck's (sic) statement is with respect to the scope of

18 the privilege.

19         MR. MCGAHREN:  We have his brief, Your Honor.

20 That's what we know.

21         THE COURT:  All right.  And does that affect your

22 determination with respect to whether to proceed?

23         MR. MCGAHREN:  We want to proceed, Your Honor.

24         THE COURT:  Okay.  You do want to proceed

25 regardless?

1      MR. MCGAHREN:  Yes, and he can raise his issues

2  after the deposition.

3      THE COURT:  All right.  So I encourage you all to

4  have discussions with one another with respect to how

5  Cotter anticipates it would use the testimony of

6  Mr. McGrath.

7      MR. MCGAHREN:  Your Honor, just so it's

8  absolutely clear, we would be using it in the CERCLA cases

9  which we signed tolling agreements for.  We're not relying

10  on advice of counsel defense because that's just not a

11  defense to CERCLA liaility in any form I've ever heard of.

12  I've never even heard of anyone asserting it in a CERCLA

13  case.  And there's toxic tort cases out there as well, Your

14  Honor, the Strong case.

15      THE COURT:  The United States is clearly

16  unsatisfied by this statement by you, and so I am going

17  to --

18      MR. MCGAHREN:  He went into equitable allocation,

19  which is not a defense.  Equitable allocation is a very

20  broad topic which is left to the discretion of the district

21  court judge who could apply equitable factors in

22  determining parties' respective shares of responsibility.

23  And that involves the facts and we are trying to elicit the

24  facts.

25      THE COURT:  All right.  I understand.  But if the

1  facts also include that Mr. McGrath told me this was okay,

2  right?

3          MR. MCGAHREN:  I don't think that's going to be

4  the case.

5          THE COURT:  That's why I want you all to talk

6  about it.  All right.  I want you all to have that

7  discussion so that --

8          MR. MCGAHREN:  He's going to testify that he told

9  the United States --

10          THE COURT:  -- So that the United States can

11  have -- can be in a position to make a legal argument, if

12  it chooses to, that use of that testimony -- and I think we

13  would all be better advised with respect to that argument

14  once we know what the testimony is.  Now, we know more than

15  we usually know because we have this affidavit and we have

16  this memorandum.

17          MR. MCGAHREN:  And all the documents that most of

18  them say Mr. McGrath on them.

19          THE COURT:  And so I want you all to speak with

20  one another about how Cotter intends to use the testimony.

21  And if that leaves open questions by the United States then

22  you can ask Mr. McGrath those questions, and presumably you

23  all can reach some level of definition as to how the

24  testimony is going to be used, at least by the plaintiff.

25  You all may decide you have your own uses of that testimony

1  as well.  And then you would be able to make any additional

2  waiver argument that you would, such that, well if the

3  defendant, if Cotter uses the testimony in this way that's

4  fine, but if Cotter attempts to use the testimony in this

5  way, we believe that would constitute a waiver which would

6  allow us to see further documentation and ask further

7  questions of Mr. McGrath with respect to these matters.  If

8  Cotter says I'm not doing that, then that could be stated

9  on the record and presumably would constitute a limitation

10  of Cotter's use of it, and we wouldn't have to get into

11  those other issues.  Is that fair or am I missing

12  something?

13        MR. BECK:  That is a good application of the

14  fairness doctrine which is what I think we're talking about

15  here.  If they use attorney-client communication as a sword

16  they can't use them as a shield is the way put by some

17  courts.  I just want to make sure that I'm on record saying

18  I agree with Mr. Dupre, that in an equitable allocation

19  proceeding among the three parties the United States has

20  identified as potentially liable to clean up the Westlake

21  site who are Cotter Corporation, Bridgeton Landfill, and Mr

22  Dupre's client, the United States Department of Energy

23  fault is an important factor.  And Cotter might assert,

24  would be expected to assert that it acted in good faith and

25  was not at fault based on largely on what Mr. McGrath may

1  says in the declaration, in the memo, and may say at

2  deposition --

3          THE COURT:  But can we reach an understanding

4  that if the reason Cotter is relying on what Mr. McGrath

5  says at his deposition is because Mr. McGrath testifies I

6  told the regulators X, Y and Z.  We thereafter proceeded in

7  that fashion and no regulator ever came to me and told me

8  that was a problem, or regulator told me, oh, okay, that

9  that is different than Mr. McGrath saying, look, I've

10  looked at all these regulations and I think this is okay

11  for you to do.

12          MR. BECK:  The discussion with the regulator's

13  entirely unprivileged, Your Honor.

14          THE COURT:  All right.  So, I don't think we know

15  exactly what Mr. McGrath is going to say.  If I am

16  understanding Mr. McGahren correctly, and I have a lot of

17  leaps here since I've hardly permitted him to speak, his

18  position is that Cotter is relying on nonprivileged

19  facts.

20          MR. MCGAHREN:  Yes, Your Honor.

21          THE COURT:  Is that correct?

22          MR. MCGAHREN:  Yes, Your Honor.

23          THE COURT:  And so after that deposition is

24  taken, I think that you all will be in a better position to

25  look at what has been offered and say is this what you're

1    relying on, because if so, we don't know the basis for it,

2    or whatever the problem may be.

3            MR. BECK:  Yes, Your Honor, that's better.

4            MR. DUPRE:   If I may, Your Honor, generally I

5    take the approach you've laid out is a good one.  I think

6    one of the big issues for the United States -- and to be

7    clear I also represent EPA in this matter as well with my

8    colleague David Dain on the phone -- is that we really are

9    to be perfectly honest unclear as to how Cotter intends to

10   use the testimony it elicits later and brought this because

11   we thought it was unclear of the petition.  And one thing

12   that I think could be helpful, while I don't think we need

13   any sort of orders from the Court, I think if Cotter could

14   commit here to, for instance, sending us a letter by

15   Wednesday saying we intend to use Mr. McGrath's testimony

16   to support the following arguments or however they intend

17   to use it would be helpful to make sure we have that back

18   and forth before the depositions start six days from now.

19           MR. MCGAHREN:  I can't predict the future, Your

20   Honor, I just can't do that.  I don't know what lawsuits

21   the United States is going to file.  All we're looking to

22   get out of this deposition is facts from the only witness

23   who talked to the regulators at the time period of

24   interest.

25           THE COURT:  I understand what you're saying, but

1  again I think that would be easier for the parties to

2  attempt to address after the deposition's been taken.

3          MR. DUPRE:  Understood, Your Honor.

4          THE COURT:  All right.

5          MR. BECK:  I agree, Your Honor.  I have one other

6  point when we get done with all the points we're talking

7  about.

8          THE COURT:  So what I would like to do is for you

9  you all to go forward and take this deposition.  And I

10  assume that Cotter is going to permit -- so for example,

11  some of the things that we have talked about.  So in

12  paragraph 21 where he says this was the first time Cotter

13  learned of AEC's policy.  I assume that Cotter is going to

14  permit counsel to ask Mr. McGrath what the basis is of that

15  statement.

16          MR. MCGAHREN:  Yes, Your Honor.

17          THE COURT:  Because if the basis of that

18  statement is, well, based upon all my conversations with

19  Cotter that we were having are X, Y, Z, there may be

20  different waiver analysis than otherwise.

21          MR. MCGAHREN:  Your Honor, my concern is there's

22  going to be a battery of lawyers asking this 86 plus year

23  old man questions.  They are going to have a full and fair

24  opportunity to ask questions.  We've laid out the

25  anticipated testimony which is what we are required to do

1 under Rule 27. We can deal with any follow-up issues

2 after.

3 THE COURT: Right. And the only reason why --

4 that's why I've been trying to focus on the affidavit more

5 than the memo, because there are statements in this

6 affidavit most of which caused me no concern. But there

7 are statements in this affidavit that do cause me some

8 concern with respect to attorney-client privilege issues.

9 And I would be in a better position to analyze whether

10 there is or is not a waiver once I hear the testimony. And

11 I'm assuming that when you say you have laid out the

12 testimony you expect to elicit, that that is the testimony

13 as contained in this affidavit?

14 MR. MCGAHREN: Your Honor, that's the witness's

15 declaration.

16 THE COURT: Right. And so that has already been

17 produced to the parties and presumably Cotter has already

18 had a full and fair opportunity to review that affidavit

19 and made a determination before it was produced that it

20 didn't believe that the attorney-client privilege was being

21 waived --

22 MR. MCGAHREN: Yes, Your Honor.

23 THE COURT: -- By any of the statements in

24 that.

25 MR. MCGAHREN: I don't decide that issue, Your

1  Honor, but we did review it.

2          THE COURT:  Right.  So I do think that there are

3  statements in here that you know nobody is going to have a

4  problem with saying that on X date I sent this letter to

5  the regulator and this is a true and correct copy of that

6  letter.  I assume that we're not going to have any issues

7  with respect to that and that it is very appropriate for

8  Cotter to be attempting to elicit this testimony because it

9  may be the only way to properly establish the foundation

10 for some of these records at this stage.  And I assume that

11 there will not be any unreasonable intense grilling of

12 Mr. McGrath with respect to that.

13         MR. BECK:  I'll go you one further, Your Honor,

14 and say that if at the end of the deposition, which is two

15 days, if Mr. McGahren feels somebody has abused

16 Mr. McGrath, to bring it to the Court's attention with a

17 motion to terminate or limit.

18         THE COURT:  Well, you all always know you have

19 that opportunity.

20         MR. BECK:  We won't.

21         MR. MAGAHREN:  I don't think that's going to be

22 an issue here, Your Honor

23         THE COURT:  No, I don't either.  I mean, honestly

24 you all are professionals and I'm assuming that we are all

25 mindful of the context here and of the witness, and that

1    there are paragraphs in this affidavit that I believe

2    reasonably give rise to follow-up questioning to determine

3    the source or the information or the purpose so that the

4    parties can make whatever fair arguments with respect to

5    waiver of the privilege that they wish to make.

6              MR. GREENBERG:  We agree, I think, on the

7    approach.  We probably agree also on the general rule in

8    terms of the communications.  But when you look at the

9    declaration, as you've pointed out, there are some

10   paragraphs here that cry out for attorney-client

11   information.  And I specifically want to direct the Court

12   to paragraph 24 when Mr. McGrath states that he understood

13   that mixing toxic, hazardous, radioactive material with

14   soil was appropriate under the rules.  What it doesn't say,

15   of course, is whether he communicated that information to

16   anyone.  And we will be asking those questions and

17   Mr. McGahren may well be asserting attorney-client

18   privilege at that point and we'll be back here on that very

19   issue.

20             THE COURT:  Well, and that could be and that's

21   why I thought we would be in a better position to make a

22   determination with respect to some of these.  Because there

23   are a few statements in here that -- in the affidavit, just

24   so that I'm clear -- where I asked myself, so is

25   Mr. McGrath purporting to testify as an expert witness.

1   And if what Mr. McGrath is offering here is an opinion

2   based upon his knowledge, but he was not retained by Cotter

3   to make that assessment for Cotter, he was retained rather

4   to have these communications, and this is his opinion but

5   he was not retained by Cotter to offer that opinion and did

6   not offer that opinion to Cotter, we have a very different

7   analysis of the issue then if in fact he arrived at that

8   opinion and shared that opinion with Cotter prior to these

9   actions being taken by Cotter.  Because if what it is is an

10  expert opinion that he has come to now, then some judge

11  later can decide whether Mr. McGrath has been properly

12  noticed as an expert witness and whether that expert

13  opinion should be permitted.

14          If instead these are opinions that Mr. McGrath

15  was retained to reached and he shared those opinions with

16  Cotter, we may have a very different analysis with respect

17  to privilege, and then there may well be a waiver and the

18  scope of that waiver is something we will have to

19  determine.  All right?

20          MR. GREENBERG:  Yes, Your Honor.

21          THE COURT:  And I can't tell from paragraph 24

22  where he says that my review of the regulations combined

23  with this indicated that diluting that was permissible.

24          MR. GREENBERG:  Frankly, if it's his opinion and

25  it's not communicated to anyone, it's irrelevant.  But the

1  questions at the deposition are going to go to whom he

2  communicated that with.  If Mr. McGahren then asserts

3  attorney-client privilege, we will be back on that issue,

4  obviously.

5          THE COURT:  Except if the only person he

6  communucated it to was the regulator, then that's not a

7  waiver either.

8          MR. GREENBERG:  Correct.

9          THE COURT: All right.

10          MR. MCGAHREN:  Thank you, Your Honor.

11          THE COURT:  All right.  Now Mr. McGahren, I

12  haven't let you talk very much and sometimes that's a wise

13  thing to do, but is there anything you wish to offer

14  further?

15          MR. MCGAHREN:  Not at this time, Your Honor.

16          THE COURT:  So my understanding is that the

17  parties are going to proceed with this deposition on the

18  dates scheduled.  And that the parties will all conduct

19  themselves very professionally, and will not be

20  unnecessarily quizzing Mr. McGrath with respect to matters

21  that are simply fact matters, but that the parties will not

22  be prevented during this deposition to the extent they are

23  being faced with things like paragraph 24 or paragraph 23

24  from inquiring as to the basis of the opinion reached.  For

25  instance, what was the source of the information?  Was that

1  from the client and for what purpose was it obtained?  Or,

2  the nature of how certain matters were communicated to the

3  client; in other words, was this opinion in paragraph 24

4  related to the client, and if so, when and how and for what

5  purpose so far as Mr. McGrath understood.  Is that fair,

6  Mr. McGahren?

7       MR. MCGAHREN:  I'm fully expecting that.  Thank

8  you.

9       THE COURT:  Now you had another matter

10  Mr. Beck.

11       MR. BECK:  I do have one, Your Honor.  And

12  certainly, let me say that we don't regard ourselves as

13  bound to limit ourselves to the information Cotter seeks.

14  We intend to ask Mr. McGrath about other things that he

15  knows personally about the case that are unprivileged, but

16  if we ask any questions that come across as difficult

17  questions, we will certainly ask them cheerfully and

18  professionally and be very nice to Mr. McGrath when we do

19  it.

20       I do have a question about the sequence for the

21  deposition, Judge.  I've never had a Rule 27 hearing either

22  because I've always entered into agreements with opposing

23  counsel in every one.  Often in a case like this where the

24  other side has unique access to the witness and I cannot

25  contact the witness about the subject matter of his

1  testimony, it's been agreed to by the parties to have a

2  essentially discovery deposition for some limited period of

3  time at first, and then the preservation testimony with a

4  much more limited cross-examination than the deposition

5  testimony would have been, knowing that that deposition

6  will be used in a trial, or in multiple trials perhaps.

7  And we had set this up in that way in October when this

8  deposition was first going to be scheduled.  Mr. McGrath

9  was made available.

10          THE COURT:  You mean with respect to the state

11  case?

12          MR. BECK:  It was at least in respect to the

13  state case, there was some discussion, I don't know if the

14  United States had been involved yet or not.  But we

15  subpoenaed Mr. McGrath for the day before the day Cotter

16  wanted to depose him.  The subpoena was served in Maine and

17  is not operative in Florida by any means.  But what I'm

18  asking for, Your Honor, is to consider since Rule 27 gives

19  Your Honor control over the manner in taking the deposition

20  in whatever way Your Honor believes is reasonable, we would

21  ask that you allow the parties who haven't had a chance to

22  talk to Mr. McGrath to ask their discovery questions first,

23  and then let Mr. McGahren or his partner, whomever takes

24  the deposition, preserve the testimony, and let the

25  cross-examination come in on a crisper more brief way.  I

1   don't think the overall deposition will be lengthened, it

2   would be shortened, but the defense will ask better

3   questions that are more useful if it's done that way, and

4   that's the way I've had it done every other time and it's

5   the way we had set up when we were going to do it in Maine

6   in October.  So that's our reqest that the parties

7   appearing at the deposition, other than Cotter, be able to

8   ask some questions first before we start the preservation

9   deposition.

10          MR. MCGAHREN:  Yes, Your Honor.  And what I would

11  suggest is that they do that on day one.  We want to start

12  out with a fresh witness, because we are taking a trial

13  deposition, on day two.

14          MR. BECK:  That's perfect.

15          THE COURT:  Everybody agreeable to that?

16          MR. DUPRE:   My apologies.  I'm a little

17  confused.  So Mr. McGahren, are you fine with Bridgeton

18  taking a deposition -- excuse me, a fact deposition first?

19          MR. MCGAHREN:  I said what I said, which is day

20  one he can take a discovery deposition, everyone can ask

21  their discovery questions.  Day two, I want to start with

22  the witness fresh, first thing in the morning.

23          MR. BECK:  Thank you for that clarification.

24          THE COURT:  So day one would be discovery

25  deposition; day two would be the deposition for purpose of

1  preserving the testimony, with the understanding that the

2  deposition would potentially remain open for the parties to

3  come and tell me, based upon the record that is developed

4  at the deposition, why additional information or testimony

5  is appropriate.

6          MR. BECK:  Of course.

7          THE COURT:  Does that work for everyone?

8          MR. MCGAHREN:  Yes, Your Honor.

9          MR. DUPRE:   Yes, Your Honor.

10         MR. BECK:  Thank you.

11         THE COURT:  Anyone on the telephone want to weigh

12 in?

13         MR. SODEN:  Your Honor, just fact checking a

14 little bit.  Was it the Court's understanding that the

15 parties are going to talk this week before the deposition

16 to try to define Cotter's use for this testimony, or have

17 we passed by that?

18         THE COURT:  Well, I encourage you all to have

19 that discussion because I think that the other parties here

20 who are listed as the defendants in this matter, you ought

21 to sit down with Cotter and have a discussion and say are

22 you seeking to do this, are you seeking to do that, because

23 Cotter may or may not be in a position to say, no, to some

24 of those things which may cause the parties to have more

25 comfort with respect to the future use of the deposition.

1   If Cotter's response is, I don't know, I can't tell you

2   that, then I suggest you all are going to have to go

3   forward with the deposition and that you all will be free

4   to make whatever arguments you are seeking to make to me

5   and/or the state court judge after this deposition has been

6   taken.  And some day if and when it is relevant and someone

7   is seeking to use this deposition, other issues can be

8   determined at that time depending upon what purpose the

9   deposition is being offered for at that time.  Because all

10  I would be looking at is whether we have a waiver, which is

11  going to subject Cotter to making further disclosure to the

12  parties.  I am not going to limit the subject matter of

13  that deposition for any future trial unless you all agree

14  to that limitation, in which case I will memorialize your

15  stipulation.  But the use to which that deposition can be

16  put at a future date is going to be a decision that that

17  judge is going to make on that future date.  I will not

18  place any limitation on the use of the deposition at this

19  point in time.  I will simply be making a determination

20  whether a full and fair opportunity to depose the witness

21  has been provided.

22          MR. BECK:  Thank you.

23          THE COURT:  Does that make sense?

24          MR. MCGAHREN:  Yes, Your Honor.  Thank you.

25          THE COURT:  I know there was a -- so to the

1   extent anyone is asking me to limit it, I'm not going to do

2   so at this point because I don't think that that is my job

3   at this point.  I think you all have a pretty clear

4   indication and a pretty full record of the subject matter

5   of the deposition and the questioning that Cotter intends

6   to ask.  So I don't think that anybody can claim surprise

7   with respect to that.

8          MR. SODEN:  Your Honor, thank you for that

9   clarification.  This is Steve Soden again.  But to be clear

10  on the operation of Rule 27, the deposition for future use

11  in federal cases is not limited to the Cotter petition and

12  the facts alleged in there.

13         THE COURT:  I'm sorry, I have to tell you that I

14  didn't quite hear all that you said.  So if I could get you

15  to repeat it, please.

16         MR. SODEN:  Okay.  Just because it is a Rule 27

17  and they have filed a petition outlining the facts to

18  elicit, that the deposition itself in future federal court

19  should be limited to the petition, the facts alleged in the

20  petition.

21         MR. MCGAHREN:  Does that mean you are taking the

22  position Mallinckrodt couldn't use it for anything else?

23         MR. SODEN:  The deposition itself limited to and

24  for use in future federal court proceedings, then the Rule

25  27 should be limited to the petition.

1          MR. MCGAHREN:  The rule speaks to reasonable

2     uses, and as I said, Your Honor, I can't predict the

3     future.  We do have two tolling agreements which we

4     disclosed in our petition that have been entered into the

5     United States, one of which deals with claims under CERCLA

6     for Latty Avenue, and the other which deals with claims

7     under CERCLA for Westlake Landfill.  So we know about

8     those.  We've also identified that there are toxic tort

9     cases, numerous toxic tort cases out there, including some

10    before Your Honor.  So we have disclosed everything that we

11    know and I believe the rule is confined to using it for

12    reasonable uses and I think we've been reasonable in our

13    disclosure.

14         MR. SODEN:  Your Honor, Rule 27 explicitly by its

15    terms applies only to cases not yet filed.  So as far as

16    the toxic tort cases out there, other than Strong, would

17    not apply, would not apply to McClurg.  The first line of

18    Rule 27 puts McClurg outside the scope of anything that's

19    going on here.

20         THE COURT:  And I have to tell you folks, you are

21    referencing an issue that I have not looked at so I'm not

22    sure I understand what the issue is.

23         MR. MCGAHREN:  It wasn't raised in Mallinckrodt's

24    papers.  They sought to preclude the use of the deposition

25    against Mallinckrodt in their papers, so I'm hearing this

1   for the first time as well, Your Honor.  I'm not quite

2   sure --

3           MR. SODEN:  To be clear, all I'm asking is in

4   response to the Court's statement that she's not going to

5   put limits on the deposition, is that the deposition for

6   any future use in federal court is limited to the petition

7   filed under Rule 27 because that's how it works.  You file

8   your petition and say this is what it's going to be about

9   and that's what allows you to perpetuate the testimony in

10  what would otherwise be a very unfair situation.  So you

11  give everybody the facts and go take your deposition based

12  on those facts, and then its future use is limited to the

13  scope of that petition.

14          THE COURT:  The scope of what petition?  The Rule

15  26 (sic) petition?

16          MR. SODEN:  Yeah, Cotter's Rule 27 petition.

17  Sets forth their alleged facts for the Basis of

18  perpetuating the testimony.  It's in paragraph 6 of their

19  Rule 27 petition.

20          MR. MCGAHREN:  He said paragraph 26?

21          THE COURT:  Paragraph 6 of the Rule 27, so

22  document number one, paragraph 6.

23          MR. MCGAHREN:  Okay.  The petition also mentions

24  the Strong case.

25          MR. SODEN:  The petition mentions the Strong

case, but we're here on Rule 27 and perpetuating the
testimony for future use in federal court.  And Rule
27(a)(1)(A) says that the petition must state that the
petitioner expects to be a party to an action recognizable
in a United States Court but cannot presently bring it or
cause it to be brought.  Does not apply to pending
actions.

          MR. MCGAHREN:  There is another case, Your Honor,
which is currently in mediation and we have signed a
mediation agreement.  This involves the tolled claims by
the United States for the Westlake Landfill.  Mr. Beck's
client has also brought a contribution action which has
been swept under conundrum of that mediation where
Bridgeton Landfill sued Mallinckrodt and EverZinc for
contribution under CERCLA.  My client, Cotter, is not
currently a party to that litigation, but we would
certainly seek to use the deposition if we did join that
litigation after the mediation concludes in one manner or
another.  But I don't know, Your Honor, what lawsuits are
going to happen in the future.  I'm only aware of the
existing actions, and we've done the best we can to
identify reasonable uses of the deposition which is what
Rule 27 requires.

          THE COURT:  Are there particular topics that you
intend to inquire with respect to Mr. McGrath that are not

1  listed in the petition?

2       MR. MCGAHREN:  I think the facts are basically

3  the same, Your Honor, it's just that they might get

4  transposed and used differently in different litigations

5  depending on the legal issues.

6       THE COURT:  Do you feel that the petition that

7  you have filed with respect to the Rule 27 -- does Cotter

8  have any problem being limited to what is in the Rule 27

9  petition to the extent that that position is being used in

10  future federal action?

11       MR. MCGAHREN:  So long as that's how all parties

12  are limited.  We've laid out what the facts were that this

13  witness was going to testify to to the best of our ability.

14  At the deposition there may be questions asked.

15       THE COURT:  I mean, Mr. Soden, I feel like

16  there's something else going on here that you know about

17  that I don't know about.  And honestly, I do not understand

18  what the purpose of this questioning is, and I feel like

19  maybe I'm in the position of getting sandbagged here and I

20  don't want that to happen.

21       MR. SODEN:  No, I'm not trying --

22       THE COURT:  I don't get it.  I don't get what

23  we're talking about.  My understanding here is that Cotter

24  has requested to take this deposition.  It has in a fair

25  amount of detail laid out the topics that it intends to

1  explore.  Those topics are further elucidated in the

2  affidavit that was filed that everybody is going to be free

3  to inquire about.  And it's my understanding that this

4  deposition will also be taken for a second purpose which is

5  for use in the Strong case.  I don't know diddly squat

6  about the Strong case.  I do not know what the issues are

7  there.  I do not know how those issues may diverge from the

8  issues that are raised in this petition.  But my

9  understanding is that the parties anticipated that both --

10 that Mr. McGrath would be -- the parties would be seeking

11 testimony with respect to both matters.  And so I'm

12 assuming unless somehow the Strong case is identical to

13 these hypothetical cases that maybe have not been filed

14 yet, that there may be topics that are inquired about that

15 are relevant to the Strong case that would otherwise not

16 have been detailed in the Rule 27 petition.  And are we

17 going to sit around and be parsing every question as it is

18 asked to make that determination?

19         MR. SODEN:  No, Your Honor.  I'm not trying to

20 sandbag, I'm not trying to clog up the works.  They could

21 very well be relevant in Strong that are not covered by the

22 Rule 27 petition.  That would not be grounds for an

23 objection to a deposition being taken in Strong, I suppose.

24 I'm just talking about the operation of Rule 27 and its

25 perpetration of testimony for future use in federal court.

1　So if that did happen, there are questions outside the

2　bounds of the petition, that would be testimony that would

3　not carry forward under Rule 27 and be able to be used

4　against the parties who have been noticed up in this

5　proceeding.  Because I'm not a part of Strong either --

6　　　　　　THE COURT:  Mr. Soden, why don't you tell me a

7　hypothetical question that you are concerned about.  I

8　just --

9　　　　　　MR. SODEN:  For example, anything about

10　Mallinckrodt, my client, there is nothing in the petition

11　about that.  I don't know if people are going to ask

12　Mr. McGrath about Mallinckrodt, but that's not part of the

13　petition and that should not be part of any testimony that

14　is perpetuated.

15　　　　　　MR. MCGAHREN:  I think the petition does mention

16　Mallinckrodt, but I don't believe that that's going to be a

17　subject of this witness's knowledge.

18　　　　　　THE COURT:  Well, Mr. Soden, I'm going to assume

19　that we're not going to have a whole lot of irrelevant

20　questions asked here, but as you know, this deposition is

21　being taken for the purpose of preserving testimony.

22　Nobody is making a determination as to its use now.  And if

23　in fact there is questioning that takes place that you

24　believe is reasonably outside the scope of the Strong

25　litigation and outside the scope of the Rule 27 petition,

1   then I suggest that you make an objection to preserve it

2   for the record.  And some day some judge will determine

3   whether that was a good objection and whether that

4   testimony will be permitted.

5           MR. SODEN:  Thank you, Your Honor.  I was just

6   mainly wanting to clarify their comments about no

7   limitations.

8           MR. MCGAHREN:  There are other litigations out

9   there, Your Honor, that we haven't been named in these

10  litigations.  There's a Kitchin lawsuit that has been

11  brought against Mr. Beck's client, or at least some of

12  them, for Westlake Landfill, which was remanded to state

13  court, is now before the Eighth Circuit on a limited issue

14  that I can't speak to.  We haven't been joined in that

15  case.  It may end up in federal court, it may end up in

16  state court, I just don't know, Your Honor, I can't predict

17  that.

18          THE COURT: All right.  As you stand here today,

19  are there issues with respect to Mallinckrodt that you

20  anticipate asking Mr. McGrath?

21          MR. MCGAHREN:  I don't think Mr. McGrath knows

22  anything about Mallinckrodt other than the fact that they

23  generated all the waste at issue.

24          THE COURT:  And I saw reference to that in the

25  affidavit.

1      MR. MCGAHREN:  Yes, Your Honor.  It's

2   identified.

3      THE COURT:  So that fact has been stated in the

4   affidavit that Mr. McGrath may or may not be asked about.

5   But in the event that Cotter intends to ask some line of

6   questions with respect to Mallinckrodt, I am going to ask

7   Cotter to disclose the line of questioning that it intends

8   to ask in advance of the deposition.  Any problem with

9   that?

10      MR. MCGAHREN:  No, Your Honor.

11      THE COURT:  Does that take care of you Mr. Soden?

12      MR. SODEN:  Yes, Your Honor.  Thank you.

13      THE COURT:  And I don't mean to limit your

14   ability to make an objection.  You all will be free to

15   preserve your objections for the record so that some judge

16   some day can make a determination whether that question and

17   answer will be permitted to be offered to the jury.  Okay?

18      MR. SODEN:  Yes.

19      THE COURT:  All right.  Now, after this

20   deposition is taken I assume that you all will be in a

21   position to have some sense of the issues that you may want

22   still to present to me, if at all.  And so please then

23   communicate with one another with respect to those issues

24   and try to reach an agreement with respect to any further

25   briefing and the schedule for that further briefing, and

1   hopefully present that to me.  If there are aspects of it

2   that you can agree to and others not, then set that out.

3   If it would be helpful for us to have some form of

4   conference call in advance of you all moving forward, we

5   can do that.

6           I will tell you I'm scheduled to be in meetings

7   in Washington the third, fourth, and fifth of December, so

8   I will not be available those days.  I think we have

9   hearings in McClurg on the sixth, so I'll be seeing at

10  least some of you then.  And, you know, I'll be back

11  available after that, but do not assume you will be able to

12  reach me on the third, fourth, or fifth of December.  But

13  if it would be helpful to you all to have some sort of

14  conference call to discuss how to proceed, feel free to

15  call my assistant and set that up.  And otherwise, please

16  do attempt to agree on some form of briefing schedule if

17  there is anything further, and if you all decide as a

18  holiday present to me that there is nothing further that

19  you need from me, please let me know that as well.

20          MR. MCGAHREN:  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you all.  Anything

22  further from anyone on the phone?  All right.  I'm going to

23  take that as a no.  And we will be adjourned.  Thank you.

24          (COURT ADJOURNED AT 5:50)

25

1

2                         REPORTER'S CERTIFICATE

3

4              I, Patti Dunn Wecke, Registered Merit Reporter,

5    hereby certify that I am a duly appointed official court

6    reporter of the United States District Court for the

7    Eastern District of Missouri.

8              I further certify that the foregoing is a true

9    and accurate transcript of the proceedings held in the

10   entitled cause, and a true and correct transcription of my

11   stenographic notes.

12             I further certify that this transcript,

13   containing pages 1 - 58 inclusive, was delivered

14   electronically and that this reporter takes no

15   responsibility for missing or altered pages of this

16   transcript when same transcript is copied by any party

17   other than this reporter.

18             Dated at St. Louis, Missouri, this 30th day of

19   November, 2019.

20                         /s/Patti Dunn Wecke, RMR, CRR, CMRS
                                Official Reporter
21

22

23

24

25